UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| MARYANN KAYLOR, ET AL. | CIVIL ACTION NO. 21-58 |
| VERSUS | JUDGE ELIZABETH E. FOOTE |
| EISAI INC., ET AL. | MAGISTRATE JUDGE HORNSBY |

## MEMORANDUM RULING

In this products liability action, Plaintiffs Maryann ("Mrs. Kaylor") and Willard Kaylor ("Mr. Kaylor") (collectively "the Kaylors") bring claims against Eisai, Inc., ("Eisai") and Arena Pharmaceuticals, Inc. ("Arena") (collectively "Defendants") under the Louisiana Products Liability Act ("LPLA"). The Kaylors argue Defendants were responsible for distributing and manufacturing a supplemental weight-loss drug, Belviq, that was defectively designed, lacked an adequate warning, and did not conform to an express warranty. Defendants move to dismiss the Kaylors' design defect and breach of express warranty claims under Federal Rule of Civil Procedure 12(b)(6).[1] For the reasons that follow, Defendants' motions are **DENIED**.

### Background

Eisai and Arena developed Belviq as a prescription weight-loss medication that interacted with a patient's serotonin pathway to reduce his or her appetite.[2] Defendants designed the drug for

---

[1] Record Documents 25 (Eisai's motion to dismiss) & 26 (Arena's motion to dismiss). See Record Document 26-1 (stating "for the reasons set forth in Defendant Eisai Inc.'s Memorandum of Law in Support of its Motion to Dismiss . . . [Arena] also moves to dismiss Plaintiffs' Amended Complaint for claims . . . for breach of express warranty . . . and design defect . . . under Federal Rule of Civil Procedure 12(b)(6).") (citations omitted). Eisai is a corporation involved in the research, development, sales, and marketing of pharmaceutical products. Record Document 20, p. 4. Arena is a biopharmaceutical company focused on discovering, developing, and commercializing oral drugs. Id. at 5.

[2] Id. at p. 6.

patients to use alongside a healthy diet and increased exercise.[3] In Belviq's early pre-market studies, Defendants engaged in clinical trials that tested the medication's cancer risks on lab rats and mice.[4] The data from these early studies showed higher rates of cancer in the rodents that were given Belviq compared with those that were not.[5]

Defendants first sought FDA approval for Belviq in 2009, but were unsuccessful.[6] When the FDA advisory committee voted against approving the drug, it cited Defendants' clinical trial studies and stated that "the potential benefits did not outweigh the potential risks."[7] In response to the FDA's decision, Defendants convened a "pathology working group" to reassess data from their pre-market studies.[8] After further review, the group concluded that the higher cancer rates in the rodent test groups were linked to a characteristic particular to only rats and mice.[9] Defendants presented these findings to the FDA in 2011, and the advisory committee accepted the group's reasoning and approved Belviq in 2012.[10] Shortly thereafter, Defendants jointly launched Belviq in the United States.[11]

Even though it approved Belviq, the FDA mandated that Defendants continue conducting safety studies on the medication.[12] As a result, Defendants engaged in multiple post-market trials aimed at further understanding Belviq's cancer risks on humans.[13] The findings of these post-

---

[3] Id.
[4] Id. at p. 9.
[5] Id. at p. 12.
[6] Id.
[7] Id.
[8] Id.
[9] Id. at p. 13.
[10] Id. at pp. 13−14.
[11] Id. at p. 7.
[12] Id.
[13] Id.

market studies, however, proved concerning.[14] Data from the trials revealed that patients taking Belviq had higher rates of cancer that increased with the length of the patient's treatment compared with control groups.[15] In response, the FDA issued a public safety announcement in January 2020 that warned patients and doctors about the increased cancer risks associated with Belviq.[16] A month later in February 2020, Defendants voluntarily requested to withdraw Belviq from the market.[17] Following Defendants' request, the FDA recommended patients stop taking the medication and dispose of unused pills.[18] It also recommended that doctors stop prescribing Belviq and to communicate with their patients about the drug's possible side effects.[19]

The Amended Petition alleges Mrs. Kaylor first noticed Belviq in magazine advertisements that promoted the drug as a safe and effective weight-loss supplement.[20] It claims Defendants' marketing persuaded Mrs. Kaylor to consult with her physician, Dr. Elizabeth Hudnall ("Dr. Hudnall"), and seek a prescription for the medication.[21] Dr. Hudnall wrote Mrs. Kaylor a prescription for Belviq in September 2014, and Mrs. Kaylor took the medication as prescribed through March 2015. In 2020, Mrs. Kaylor was diagnosed with breast cancer and claims Belviq was the cause.[22]

The Kaylors now bring this action and allege Defendants are liable for their damages.[23] They filed an Amended Petition pursuing three products liability theories under the LPLA: (1)

---

[14] Id. at p. 16.
[15] Id.
[16] Id.
[17] Id.
[18] Id.
[19] Id.
[20] Id. at pp. 21–22.
[21] Id. at p. 22.
[22] Id. at p. 23.
[23] Id. at p. 26.

inadequate warning; (2) breach of express warranty; and (3) defective design.[24]  Mr. Kaylor also brings a fourth cause of action for loss of consortium.[25]  Defendants filed motions to dismiss the Kaylors' design defect and breach of express warranty claims arguing that the Kaylors' pleadings are inadequate as a matter of law.[26]  The Kaylors oppose the motion.[27]

## Standard of Review

Federal Rule of Civil Procedure 12(b)(6) allows for dismissal of an action "for failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  While a complaint attacked by a Rule 12(b)(6) motion need not contain detailed factual allegations, in order to avoid dismissal, the Plaintiff's factual allegations must "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (citation omitted).  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. (citation omitted). In determining whether a plaintiff has pled factual allegations to state a claim that is plausible, the Court may not evaluate the Plaintiff's likelihood of success but must construe the complaint liberally and accept all of the Plaintiff's factual allegations in the complaint as true.  See In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

---

[24] Id. at p. 2.
[25] Id. at p. 1.
[26] Record Documents 25 & 26.
[27] Record Document 28.

**Analysis**

The Kaylors allege Defendants designed, distributed, and manufactured an unreasonably dangerous drug—Belviq—that purportedly caused Mrs. Kaylor to develop breast cancer. As noted above, the Kaylors base their claims in products liability. In Louisiana, products liability actions are governed by the LPLA, which "establishes the exclusive theories of liability" against manufacturers "for damage caused by their products." La. Stat. § 9:2800.52. Recovering under the LPLA requires a plaintiff to show: "(1) that the defendant is a manufacturer of the product; (2) that the [plaintiff's] damage was proximately caused by a characteristic of the product; (3) that this characteristic made the product "unreasonably dangerous"; and (4) that the [plaintiff's] damage arose from a reasonably anticipated use of the product by the [plaintiff] or someone else." Stahl v. Novartis Pharms. Corp., 283 F.3d 254, 260–61 (5th Cir. 2002) (citing La. Stat. § 9:2800.54(A)). A plaintiff may prove a product is "unreasonably dangerous" in several ways. For example, the product at issue may be unreasonably dangerous: in construction or composition; in design; because of an inadequate warning; or because the product did not conform to the manufacturer's express warranty. Id. at 61.

Here, the Kaylors' Amended Petition alleges: (1) Defendants manufactured Belviq; (2) Mrs. Kaylor's breast cancer was proximately caused by this medication; (3) the medication was unreasonably dangerous because it lacked an adequate warning, had a design defect, and failed to conform to Defendants' express warranties; and (4) Mrs. Kaylor's cancer developed after using Belviq as prescribed. Defendants do not challenge the Kaylors' claims on elements (1), (2), or (4), but instead take issue with the pleadings on element (3), namely, whether the Kaylors have adequately alleged a design defect or an express warranty claim. The Court will therefore address these two disputed theories of liability in turn.

A. <u>Design Defect</u>

A product is unreasonably dangerous in design if, when the product left the manufacturer's control, "[t]here existed an alternative design for the product that was capable of preventing the claimant's damage," and "the danger and gravity of that damage outweighed any adverse effects on the utility of the product and the burden on the manufacturer of adopting the alternative design." <u>Flagg v. Stryker Corp.</u>, 647 F. App'x 314, 316 (5th Cir. 2016) (quoting La. Stat. § 9:2800.56). To state a design defect claim, the Kaylors must allege (1) that "an alternative design existed" at the time Defendants manufactured Belviq and (2) "that the risk avoided by using the alternative design . . . would have exceeded the burden of switching to the alternative design." <u>Roman v. W. Mfg., Inc.</u>, 691 F.3d 686, 701 (5th Cir. 2012) (quoting <u>Lawrence v. Gen. Motors Corp.</u>, 73 F.3d 587, 590 (5th Cir. 1996)).

First, in arguing an alternative design existed, the Kaylors allege Defendants designed Belviq with an ingredient that reacted with "serotonin receptors" to supposedly reduce a patient's appetite.[28] They claim this reaction was the catalyst that encouraged cancerous cell growth, and specifically, the interaction that stimulated cancer growth in Mrs. Kaylor.[29] To create a safer product, the Kaylors contend Defendants should have instead designed Belviq as a weight-loss supplement that avoided the "serotonin pathway" altogether.[30] According to the Amended Petition, the exact details of this alternative design are in Defendants' exclusive custody.[31] In response, Defendants argue these pleadings are inadequate and conclusory principally because the Kaylors fail to specify an alternative design with any detail.[32]

---

[28] Record Document 20, p.1.
[29] <u>Id.</u> at pp. 14, 28.
[30] <u>Id.</u> at p. 29.
[31] <u>Id.</u> at p. 28.
[32] Record Document 25-1, p. 8.

6

To be sure, a plaintiff cannot state a plausible design defect claim with conclusory allegations that an alternative design existed. See Baudin v. AstraZeneca Pharms. LP, 413 F. Supp. 3d 498, 504 (M.D. La. 2019) ("A conclusory allegation that an alternative design exists will not suffice[.]"). Even so, in the prescription drug context, plaintiffs are not required to plead extremely "detailed factual allegations." Fuller v. Eisai, Inc., 513 F. Supp. 3d 710, 718 (E.D. La. 2021) (quoting Flagg, 647 F. App'x at 317). This is because manufacturers may have in their sole possession necessary information to "ultimately prove the claim." Flagg, 647 F. App'x at 317. Thus, "when the cause of action requires specific elements to be proven, the plausibility standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of' the necessary claims or elements." Id. at 316 (quoting Twombly, 550 U.S. at 556) (citation omitted); see also Fuller, 513 F. Supp. 3d at 719 (accepting this "somewhat relaxed pleading standard" for a pharmaceutical design defect claim).

Here, the Kaylors' allegations satisfy this minimum standard. Their Amended Petition specifically alleges how Belviq failed—they claim the drug contained an ingredient that interacted with serotonin receptors, which allegedly encourages cancerous growth.[33] They allege how the drug caused Mrs. Kaylor's injury—they contend that because Belviq interacted with Mrs. Kaylor's serotonin pathway, she developed breast cancer.[34] And though their Amended Petition does not provide detailed blueprints of an another design, the Kaylors theorize that an alternative chemical composition would have reduced Belviq's health risk. According to the Kaylors, if Defendants designed Belviq to avoid the serotonin pathway entirely, patients would not be as likely to develop cancer.[35] To support this theory, they point to medical literature and Defendants' in-house cancer

---

[33] Record Document 20, pp. 11−12.
[34] Id. at p. 29.
[35] Id. at p. 28.

studies showing the dangerous side effects of serotonin reactors like Belviq at the time Defendants manufactured the drug.[36] These facts are more than sufficient to satisfy the first element of the Kaylors' design defect claim.

While Defendants do not challenge the Kaylors' pleadings on the second element of their claim—whether the likelihood and gravity of Belviq's damage outweighed the burden of adopting the alternative design—the Court holds that the Kaylors satisfy the relevant pleading standard in this regard as well. As noted above, "very detailed and specific allegations are not required to plead a plausible claim . . . before [a plaintiff] has had an opportunity for discovery." Flagg, 647 F. App'x at 318. Here, the Amended Petition adequately pleads that the dangers the original product posed to consumers like Mrs. Kaylor outweighed the burden of switching to the proposed alternative design.[37] Considering the detailed allegations of Belviq's association with cancer, the Court concludes the Kaylors pled "'enough fact to raise a reasonable expectation that discovery will reveal evidence of' the necessary claims or elements." Id. at 316 (quoting Twombly, 550 U.S. at 556) (citation omitted). As a result, Defendants' motions to dismiss the Kaylors' design defect claim are denied.

B. Breach of Express Warranty

In addition to a defective design, a product may also be unreasonably dangerous when a manufacturer breaches an express warranty it made about a product. See La. Stat. § 9:2800.58. To prove breach of express warranty under the LPLA, a plaintiff must demonstrate that: (1) an express warranty existed, (2) he or she was induced to use the product because of that warranty; (3) the product did not conform to that warranty; and (4) the plaintiff's damage was proximately caused

---

[36] Id.
[37] Id.

because the express warranty was untrue. Caboni v. Gen. Motors Corp., 278 F.3d 448, 452 (5th Cir. 2002) (citing La. Stat. § 9:2800.58).

The Kaylors allege Defendants provided an express warranty when they marketed Belviq as a safe and effective weight-loss supplement for use alongside a healthy diet and increased exercise.[38] The Amended Petition explains that these representations were made through magazine advertisements, product information sheets, and labels upon which Mrs. Kaylor and her physician relied.[39] According to the Kaylors, Belviq's marketing induced Mrs. Kaylor to request a Belviq prescription from Dr. Hudnall, and in turn, Belviq's safety labels induced Dr. Hudnall to grant her request and confidently prescribe the medication.[40] All the while, the Kaylors claim Defendants allegedly knew about the dangers of their cancer-causing product.[41] In response, Defendants argue these claims are conclusory.[42] They contend, in particular, that the Kaylors did not identify the content of an express warranty or an audience to whom the alleged warranty was made.[43]

Under the LPLA, an express warranty is a "representation, statement of alleged fact or promise about a product or its nature, material or workmanship that represents, affirms or promises that the product or its nature, material or workmanship possesses specified characteristics or

---

[38] Id. at pp. 21–22.
[39] Id. at p. 22.
[40] Id. at p. 23.
[41] Id.
[42] Record Document 25-1, p. 5. In addition to these arguments, Arena also contends that because it did not distribute or sell Belviq in the United States, "there can be no basis as a matter of law for Plaintiff's claims premised on any alleged express warranty." Record Document 26-1, p. 2. It asks this Court to take judicial notice of product labels on the FDA's website. But as a New York district court addressing a nearly identical cause of action involving Belviq observed: "[w]hile [Arena] provides caselaw suggesting that the Court should take judicial notice of the product labels, it offers no authority explaining why the Court should dismiss the claims." Reynolds-Sitzer v. Eisai, Inc., No. 21-0145, 2022 WL 471530, at *7 (N.D.N.Y. Feb. 16, 2022). The same is true here. Consequently, as in Reynolds-Sitzer, this Court rejects Arena's argument.
[43] Record Document 25-1, p. 5

qualities or will meet a specified level of performance." La. Stat. § 9:2800.53(6). Though a plaintiff does not need to cite a specific warranty to state a claim under this LPLA theory, he or she must still allege the content of the warranty and explain how the warranty was untrue. Kennedy v. Pfizer, Inc., No. 12-1858, 2013 WL 4590331, at *5 (W.D. La. Aug. 28, 2013). Often, courts disallow plaintiffs from using promotional materials or advertising campaigns as a basis for an express warranty claim. See, e.g., Robertson v. AstraZeneca Pharms., LP, No. 15-0438, 2015 WL 5823326, at *5 (E.D. La. Oct. 6, 2015) (holding that "statements made on [the manufacturer's] website or in its marketing materials were not warranties"). They do so because marketing materials typically involve a manufacturer's "general praise," "puffery," or a "general opinion" about the product at issue. Becnel v. Mercedes-Benz USA, LLC, No. 14-0003, 2014 WL 4450431, at *5 (E.D. La. Sept. 10, 2014).

But in the pharmaceutical context, plaintiffs can rely on advertisements as express warranties when the plaintiff shows how the alleged warranty relates to the safety or effectiveness of the product and explains why such marketing is false. Kennedy, 2013 WL 4590331, at *5; see also Harris v. Merck & Co., No. 12-1446, 2012 WL 5384720, at *5 (W.D. La. Nov. 1, 2012) (acknowledging a plaintiff may rely on a manufacturer's marketing as grounds for an express warranty claim); Guidry v. Janssen Pharms., Inc., 206 F. Supp. 3d 1187, 1199 (E.D. La. 2016) ("[T]he Court construes the marketing materials as potential express warranties."). To make this showing, a plaintiff might allege a manufacturer "suppressed information," gained significant market share with "false representations," or "induced persons to use [a] drug under the ruse of safety," with knowledge that the drug was dangerous. Id. (citing Harris, 2012 WL 5384720, at *5) (quotations omitted).

10

In this case, the Court holds that the Kaylors' Amended Petition has pled an express warranty claim.[44] The Kaylors allege in general terms that Defendants marketed Belviq through multiple mediums and warranted the medication as a "safe" and "effective" drug to manage weight.[45] Though this allegation standing alone is likely too vague to state a claim, the Kaylors supplement this pleading with specific facts linking Belviq with cancer and claim Defendants' express representations contradicted what they knew to be true. Using detailed studies and available scientific literature, the Kaylors allege Defendants knew of Belviq's purported carcinogenic nature and marketed the product as "safe" anyway.[46] Taking these claims as true, the Kaylors have pled facts that allow the Court to reasonably infer Defendants "suppressed information," and induced patients like Mrs. Kaylor "to use the drug under the ruse of safety." Id. The Kaylors' pleadings are like those in other products liability cases where plaintiffs alleged that a pharmaceutical manufacturer's knowledge conflicted with its marketing materials. See Baudin, 413 F. Supp. at 512; Boutte v. Stryker Biotech, LLC, 67 F. Supp. 3d 732, 739 (M.D. La. 2014); Harris, No. 12-1446, 2012 WL 5384720, at *5. The Kaylors' allegations therefore allow the Court to draw a

---

[44] The Court is aware that Judge Africk came to a different conclusion in a substantially similar case. See Fuller, 513 F. Supp. 3d at 724. In Fuller, Judge Africk held that the plaintiff had not pled a plausible breach of warranty claim because the petition did not reference a warranty, the plaintiff failed to "allege facts that the warranty was made to a specific audience," and the plaintiff failed to allege that the warranties "induced [plaintiff] to take Belviq." Id. at 723–24. Since Judge Africk's holding, however, the plaintiffs here have filed an Amended Petition altering their express warranty claims and adding details that allege: (1) Defendants made an express warranty in a magazine advertisement, product information sheet, and medication label; (2) the warranty was directed to patients like Mrs. Kaylor and her prescribing physician, Dr. Hudnall; and (3) the advertisements induced Mrs. Kaylor to seek a prescription for Belviq and the labels induced Dr. Hudnall to prescribe the medication. Considering these allegations, the Kaylors' pleadings are distinguishable from those at issue in Fuller.
[45] Record Document 20, p. 22.
[46] Id. at pp. 16−17.

reasonable inference that Defendants are liable for a breach of express warranty, and as a result, the Court is unwilling to dismiss this claim.

## Conclusion

For the foregoing reasons, **IT IS ORDERED** Defendants' motions to dismiss[47] the Kaylors' design defect and breach of express warranty claims are **DENIED**. This matter is **REFERRED** to the Magistrate Judge for a scheduling order.

**THUS DONE AND SIGNED** this 30th day of March, 2022.

ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE

---

[47] Record Documents 25 & 26.